In 1975, Takeda filed a patent application disposing certain antibiotic compounds, and the method for making those compounds. It filed as product claims first, and then over a decade later, filed for process claims. Counsel, we know all the facts of the case. Why the date of invention? I mean, I understand that that has some parallels with the date that can be asserted for prior art purposes, but it seems to have nothing at all to do with the double patenting notion. Well, Your Honor, this is non-statutory double patenting, of course, which is a judge-created One of the things we have to remember is what an examiner should do when an application comes in the door. Right, but the application that's coming in the door is the second application. Absolutely. That's the one that you're saying is problematic for double patenting. That's correct. It's not the first one. That's correct, Your Honor. So why in the world would the date of invention be the trigger? Why wouldn't it be the date that second application is filed? Because that's the time when the patentee is seeking to do the double patenting. Your Honor, I think it's simply more consistent with patent law generally. It's simply more consistent, but it doesn't make any policy sense. It's like saying, you know, it would be great if we all lived in the same house, but, you know, why? Why should we do that? I should point out that here, even if you look at the date that the patent application was filed, the second patent application was filed in 1990, there was no alternate process. Takeda's position is... That's not their position. They have a 1979 document, a UK patent, that is in this Dr. Dugan, I'm not sure if I'm saying the name right, expert report. And so you're saying for purposes of the two references that really have been pursued on appeal, Gerlach and Longuzzi, those two dates are after 1990. That's correct. But they may well have other references that are before that. Of course, that 1979 process is not before this court. The only focus in the district court and on appeal have been these 2002-2005 processes. That's the focus, but why can't we affirm on an alternative basis? If we did agree with you, I think that you just suggested that even if we did decide that the date of the filing of the second application was the most sensible date, if we decided to go that way, why can't we reach out and affirm on the alternative basis? Well, that argument was never presented to the district court. The 1979... I'm sure it was presented to the district court. Not in the papers in the district court. There was not that mentioned in the oral argument about the 1979 process. But the argument... Wouldn't it be possible for us upon restating a more logical cutoff point for the double patenting to remand for application at that point? And then, of course, if there is a 1979 reference, that can be taken into consideration. That is obviously open to this court to do. We don't think that's necessary. We, of course, filed our own motion for summary judgment, and Takeda had the opportunity to bring forth all its arguments, and in fact had the obligation to bring forth all its arguments for why our motion for summary judgment was not proper. The only thing discussed were these 2002... Did you appeal that to us? Did you appeal the denial of your motion for summary judgment? We didn't have our own cross-appeal. Of course, there were cross-motions for summary judgment in the district court, and the only focus of those cross-motions was whether Takeda could rely on these 2002-2005 process dates. But let me take a step back and explain why we think the effective filing date is most sensible. No, you don't say the effective filing date, counsel. The date of invention, which is generally presumed, of course, to be the effective filing date. But suppose that there was evidence... Suppose Takeda had introduced evidence during prosecution to overcome abuse of prior art,  would you then say the date of their invention, i.e., their conception date, is the date, and if that second process didn't exist on the date they conceived that, in fact, it could be introduced if that second process didn't exist? That would be an interesting question. You focused your choice of date not on the effective filing date, but on the date of invention. So that's the very choice that's before us if we adopt your position. I think if a case brought up this distinction between the effective filing date and the conception date, our position would be we think the conception date. But again, that's not what we have before us. The only alternate process that they've been able to point to is well after any... Whether it's the conception date or the effective filing date, here it's 1974, the only alternate process they have is the 1979 process, and that comes well after any sort of conceivable date of invention, even the presumed date of invention, and even earlier date of invention. And so I think this court... But if a patentee, an inventor, conceives of an invention, you're saying if a second process is not known at that very moment, that when he files his patent application sometime later in the future for the first of the two patents, that he is just completely out of luck and can never pursue the second patent. Even if before he even files for the first patent, the two processes become known, he still can't ever file for that second patent under the PTO's selection of date of invention. That's absolutely correct, Your Honor. And the reason is because... Even though at the time he's trying to secure the patent rights. Right. Because that's really the critical time. The time he's attempting to secure those rights that you find so offensive, that you find are contemplated to be double patenting. Right. As long as the process existed before that, what's the harm? There are a couple of policies that are sort of underlying the double patenting doctrine generally. One, of course, is to prevent the unjustified time-wise extension of the right to exclude. Now, from the time that you have the product patent, when you only have a single process to create that product, you're effectively getting protection for both the process and the product at that time. Because, as David admitted, at that time... I don't think I understood my question, though. So the idea is that if they were able to get a second patent with an extended patent term, then they essentially extended their right to protect both the product and the process. Because when you file that second process claim... And the facts here, I think, are instructive. In the example I gave you, the second process claim is being filed at a time when it's known there are two processes. So there really is no double patenting at that point. There's no double patenting because the process claim that they file does not identically, exclusively cover the product. Because at that time, there exist two processes. But at the time before that, before they filed their process claim... But they weren't seeking to pursue any rights of exclusivity. They wouldn't have had to because they could have simply filed the product claim. Because, again, where they're coextensive, the product and the process claims, a patent on one is effectively a patent on the other. That's the problem. I was predominantly looking, again, at the policies. Why wouldn't we want to give an incentive for them to invent other processes? And wouldn't maybe the best way to do that be the suggestion that we get from my colleague here, to set it at the date that the double patenting would arise in the second instance. So in the interim, we've given them plenty of incentive to go out and find other processes. Well, I think those incentives would still exist even under our rule. Of course, they don't need an incentive to create the process that they've already created. We're talking about... We're talking about a new one. A new one, right? And there's no question that they could get... Which would make their original process protectable. Well, they would also get a patent on the new processes, assuming that they otherwise meet requirements for patentability. That is sufficient incentive to go out and research. To research and discover new processes that they can get. So they don't need additional incentive beyond getting the patent on the thing that they're actually going out and discovering. That's what the patent statute says. You get a patent on the invention that you find. And so I don't see a reason to give them additional incentive beyond that. But the additional incentive, it seems to me, from Joe Trader's example would be... Now they would have the benefit of being able to possibly claim both processes. Where under your example, there's no way they can ever gain entitlement to claim that second process. That's absolutely right. And that's exactly the point of the double patent doctrine. Because where you have a product and a process that are substantially co-extended... But it's all about the extension of the monopoly. And there can be no extension of the monopoly here if there truly is an alternative way to manufacture this. So that process patent that they're seeking cannot be construed as extending the monopoly on the product. Because there's an alternative process for making that same product. So the very policy that you want me to protect is not being protected in this case. It's irrelevant in this case. Again, there's an extension on the monopoly for the process as well in that scenario. Because they've been able to... In 1975, they get a patent on the product. And because the product and the process are substantially co-extensive, a patent on the product is tantamount to a patent on the process. And so they've effectively gotten their protection for their process, because there are no other processes out there. Now, there is a case, a Phillips case that we're aware of, that has a situation like this. Even Phillips would have been precluded under your proposal, right? That's correct, Your Honor. The district court's case in Phillips would. And of course... We affirmed that. You did, Your Honor. But there were alternate bases for it. Do you have any conflict with the way we've applied this law here before? How do you get around our affirmance of Phillips law? Well, of course, in Phillips, there were alternative bases for the double patenting rejection. Your difference in the alternative process was disclosed in the second application. Well, and also, there was the construction of the process claim that was at issue there. There were two bases in the district court for denying the double patenting rejection. One was that they constructed the process claim that was Claim 16, finding that it didn't create the claimed product. And so the product claim and the process claim weren't coextensive. They weren't patentably indistinct. And then second was, of course, the reliance on the later-developed processes. And this court, when it affirmed, it was effectively a summary affirmance of that. And it didn't identify which of the alternative bases it was relying on. And in fact, the only basis it even adverted to was the construction of Claim 16. And so under this court's decisions in cases like Beacon Oil v. O'Leary, stare decisis only applies to legal issues that were actually decided in prior cases. If I could just ask you a question. There's been a lot of talk today in your discussion with Judge Rader, Judge Moore, focusing on policy. It does seem that we're basically called upon here to make kind of a policy call. There doesn't seem to be any—nobody has the lockdown case in their favor, neither you nor the other side. Let me ask you this. One of the arguments the PTO makes is that this would cause administrative problems for the board. Assume we come down with a decision that is not the one you're urging. To what extent could the board come forward with a regulation that would alter that? I think that would be difficult, Your Honor, because of course this court would have set forth a rule under double-patenting doctrine, the judge-created doctrine, and I don't think a regulation could overturn what this court has said. But you couldn't do anything with a regulation. I haven't—to be honest, I haven't researched the issue. I was just—since we're talking policy, I was just sort of, if you will, indulging thinking a little bit out loud. But I was just wondering. So you're saying— I'm glad you brought up the administrative convenience, though, Your Honor. But you're saying the board couldn't do—the PTO couldn't do anything either by way of an administrative— by way of a regulation or something in the mandate? I don't think that they could. I don't think that this court—I mean, that the PTO, by regulation, could essentially countermand or overturn a decision of this kind. I was thinking if it was a situation where we were—I just don't know the answer. If we were speaking on a legal—sort of making a policy call, not grounded in any hard authority, would there be any legal—maybe not. I don't know the answer to that question for sure, but just standing up here, I doubt it, Your Honor. But certainly Congress could do something. Obviously Congress could do something, but of course we're in non-statutory double patenting, which is, you know, a judge created a doctrine, and I don't know that Congress would want to step in. Okay. They might, but who knows. What do you—what are your administrative difficulties? Well, I think that the—one of the basic ones is when it comes to restriction practice, which of course is sort of, you know— It's entirely different. But it is a mirror image. Restriction practice is just—well, it's just protecting the fisk, isn't it? You're just ensuring that you get ample fees for all the various kinds of inventions that can be filed. But, you know, restriction turns on, of course, questions of whether two inventions are patently distinct. And so if you have a product and process plan, it's difficult for an examiner to know, are these patently distinct? If you don't know whether sometime in the future someone can come up with a separate process to create the product, when at time zero you have a sort of—a product and process that are coextensive. And the PTO looks to this court's double patenting decisions to determine what is—how to run restriction practice. They did so after this court's decision in OCI. And there was guidance after that about restriction practice based on what this court said in OCI. And so that, I think, is one of the major sort of administrative difficulties. And again, you know, pointing to the patent statute, Section 119 and Section 120, of course, Decatur gets the benefit because of its—because, you know, this is a continuation application, it gets the benefit of the earlier effective filing date by avoiding any, you know, any later art. But it is trying to use 119 and 120 as a shield against any sort of prior art that might affect it. But it's also using it as a sword because it's able to rely on later developed processes to establish the patentability of its patent. That just seems inconsistent with the patent statute. Thank you, Mr. Donley. We will restore Mr. Donley's rebuttal time. Thank you, Your Honor. That means we need to give Mr. Winker an additional four minutes. I'm sure we need to use it. And we have to keep our time, essentially. Mr. Winker. Thank you. Thank you, Your Honors. May it please the Court, I'd first like to address Ed Shaw's policy concern. Congress did address the policy concerns in 1995 by making patent terms key to the filing date. So I think we're talking about a problem that's been solved, but there is a problem. Then I would like to address Judge Rader's concern about Phillips. It's more than Phillips, it's Katie. And I think that we've missed the point of the binding precedent. The appellant understood that there's a binding precedent problem. And I would think we've been economical of the truth in our citation at the national table in the appellant's reply report dated 17 and 18. But counsel, even if we agree with you, if we say Phillips is binding for the outcome, because you notice, of course, the court didn't discuss, the Federal Circuit didn't discuss, double patenting. So even if we concluded that, well, we have to adopt a rule that was consistent and would have resulted in the same outcome in Phillips, if we decided we were bound, that doesn't necessarily mean we adopt your rule, which I don't understand to be any rule at all. It's any time ever somebody ever comes up with a process, and it goes back and ex post justifies the earlier filing date. That was only because the government put a line in the sand as an invention date. But I'd like to clarify that national table is consistent with the Supreme Court's ruling in Webster v. Fall. Webster v. Fall is a 1925 Supreme Court case cited by this court several times and other regional circuit courts of appeals in the Supreme Court, which in essence says the matter doesn't have to be discussed in the appellate decision. It's whether the matter was, quote, this is from Webster v. Fall, 1925, brought to the attention of the court. So it's whether the issue was neither brought to the attention of the court nor ruled upon. But again, counsel, even if I believe and agree completely with your argument, it only means that I have to reject what you referred to as the line in the sand they drew, the date of invention. Right. But it doesn't mean I adopt a laissez-faire approach to any old time into the future. So what is your line in the sand? Because clearly there has to be some sort of date. There has to be a focus on what should be the appropriate timing. I don't know if there has to be a line in the sand drawn today. You've drawn the 1990 filing date line, which we're perfectly happy with. And you pointed to the 1979 GB reference. And I would correct Mr. Donnelly that paragraph 100 of Dr. Angelina Dugan's declaration, she refers to this process of GB 276. The record we have on appeal, Mr. Wagner, is only dealing with Gerlach and Munguzi. Yes. We couldn't really find in your favor based on something that's not formally recognized. Well, you may have to remand for that, but that's a question we'd have to decide. The JA 446 we rely upon, for example, Munguzi and Gerlach, and also paragraph 100 evidence. Just a second. JA 446, paragraph 23, 446. And we include a JA 341 Munguzi here. And in JA 345, we refer to the GB 276. And to take a summary judgment motion at JA 434, we refer to Dugan paragraph 100, which has the reference that includes Dugan paragraph 100, which is at JA 280, 281, says examples of compounds falling into the scope, and lists several compounds, including the compound. What a reference discloses is a question of fact. And as an appellate court, I'm not comfortable with doing that. And so even if I agree that you put that allegation clearly on record, isn't it safe for an appellate court, if we agree with your position, while we disagree with the government's assertion, to remand for the lower court to make a decision? That would be an option if that's what you feel on that issue. But I would like to go back to the precedent again. It is not just the question of Phillips. The Cady case. The Cady case was relied upon in Phillips. That was a CCPA case. And page 109, you can see that there was not even proof of an alternative process. There was the Kirschbrown affidavit, which was submitted by the appellant Cady in order to show that there are alternative processes. And it was a speculative process. And the court said, quote, that appellant's product may be produced by processes other than the processes patented. It at least creates a substantial reasonable doubt, which in our view should be resolved in the appellant's favor. Mr. Waker, thinking again of the practical problems of what you're asking us to do, think of the confusion, say, during litigation, somebody asserts as an affirmative defense public patent. And the patentee responds with an alternative process that was published the day before, during the litigation. Now, how would we deal with that scenario? How would we set damages? When would damages be assigned if this later alternative process actually arises during the trial? That's a theoretical question, which I don't think has ever been raised before. But it's a very real sort of scenario that your lack of a line in the sand could create. I don't think it was our job to create a line in the sand. None of the cases in the past did. We have to have, at least for administrative practicality, don't we have to have some rule that makes clear when we assess double patenting? I don't think you can even reach that for this case. The appellant drew a line in the sand on the invention date, and then he does admit in his blue brief that as of the issue date, there's no problem with the policy because there's no possible extension. But I don't think you need to address that in this case. We just want this case decided. Well, counsel, I understood in the PTO brief, they adopted what I call a fallback position. I mean, they didn't just say date of invention, and if it's not that, then we lose. I mean, they also said a fallback, which was, I thought, 1981. They said the date the product patent issued. Now, I had trouble understanding why that would be the right date. But apart from that, it does seem that we have to address that argument. But that's a denominal appellate fallback position. They didn't address that below. They're bringing this up for the first time on the field. So you have a choice. If you wish to follow the line in the sand they drew here, you can affirm the case, and you have the other choice. If you decide you wish to take this case to the extraordinary thing of creating a policy line in the sand where this should be for the future, then you'd have to remand. But I would remind the court that in 1995, Congress addressed this policy problem by making all patents expire based on the effective filing date. So this problem is no longer here. I have one final question, of course, still remains. What is the patent term of that process, which at the time the product issue was the only process by which it could be made, and therefore it was receiving, as Mr. Donnelly I think correctly points out, dual protection by the product patent at the time of the filing of that product patent? Are you willing to say, then, that the process is bound to that date? Well, under the new law, it will be. I'm talking about policy of the future. Because in 1995, we changed the law so that the effective filing date would be the start of the 20-year patent term. I'm saying this is a problem. That's the patent term on the product, clearly. Now you come in 10 years later and want a patent on the process. The Patent Office is going to say that process was already protected by the product patent 10 years ago. You must disclaim 10 years of patent protection. And you're going to say, oh no, we've got an alternative process that arose the day before yesterday that gives us a right now to claim this process independently. And the filing date of that gives us 20 years from that point. That's going to be your argument, isn't it? No, Your Honor, I'm not. I'm saying if we're... Isn't that what you're saying here? No. I was pointing the 1995 change in the law of the 20-year term... I know what you're pointing to. For new cases that are filed after 1995. I understand that. And in this case... But I'm saying even under that, you're going to claim a full 20-year term for the process patent. You're going to say the process patent is not bound by the term of the product patent 10 years earlier, even though it was the only process by which you made the patent. Whether it's the only process or not, under the new law, I would be bound by the effective filing date, which would be the date of the parent case. So both patents would expire on the same date. So it's effectively like you would institute a restriction requirement on yourself. That's right. So there's no harm. Exactly right. And so this policy concern was addressed. Now, with respect to Judge Schall's question about administrative guidance, perhaps, I think some rules could be done to change the manual patent examination procedure. We're not here to decide that today, but I think that some things could be done. In fact, we rely here on the manual patent examination procedure. We've talked about alternative processes in the present tense, talking in restriction requirement, that you can show that the product can be made, not was made or made at the invention date. So I think there are some reforms that can be made in the manual patent examination procedure. And I don't know what further could or should be done in view of the 1995 statutory change. Let's talk policy a minute. The references you have here today as alternative processes to support the independent patent on your process arise in 2002 and 2005. Doesn't that pretty well upset the public's expectation that this process was already in the public domain as of 74? Well, if you look at this time slice, you may have a point. I would draw your attention to the colored chart at pages 7 to 8 to show you what's not before you today, which was at the district court. The blue process, you start at the upper left-hand corner of this chart, and you see the examiner's restriction requirement, restricting the cases between saying we have two patents. This goes back to the original 1975 disclosure, what examiner originally called the isolation. I need to hold you to my question for a second, Mr. Wigner. The public thinks it has this process. It may even be using it out there.  20 years later? Doesn't that upset the public's expectation that this particular process was in the public domain as of the filing date of the original product, at which point it was the only way of making it, and therefore it was synonymous with the product? I think in hindsight, that's the way to look at it, but looking at this prospectively. Wouldn't that support Mr. Donnelly's proposal? That has some support to his proposal, but what I'm saying is, looking at this in the industry, you have a published patent application 18 months after the 1995, and you're aware of it, and you can devise your alternative process at that time. I think that's much more of a theoretical approach you're on. Again, I'd like to go back to my chart, 87 to 8, because this particular macroscopic picture shows the full picture, not everything before you today, but you start with Examiner Rizzo's restriction requirement, the upper left-hand corner, and he said the original 75 case, the original 75 case had the acylation process, that's the plain patented gold process, and displacement process, blue, which is the Weiss Declaration, and the green, Angelina Dupin Declaration. We brought the blue Weiss Declaration into the Patent and Trademark Office in 1999, and the Patent and Trademark Office didn't even really look at it until 2005, and then said it was speculative. We brought in these other two references later because they were so clear, and we were fighting this battle to show that there is an alternative process. If you want the whole picture taken, looked at, and not just look at these two references, yes, you have to rename it. So you're saying Gerlach and Montaguzzi were just to substantiate your blue process? You're exactly right, because if you look particularly at one of the references, it actually refers to, at columns 3 and 4, the GB 176 to 1979 patent. Mr. Wigner, why wouldn't your proposal encourage people to delay filing a process patent? They can let their product patent run and run and run, as long as we know that in the interim there's been an alternative process invented. Then we can file a patent on our process and claim it separately and get another extension of 20 years on it. Well, you never can because of the 1995 law. We're talking, again, it's a policy. What Congress can do, it already did. In 1995, we changed the law so that all patents will expire as of their effective filing date. So you can't have a situation as we had here. And I would add an asterisk to this. Throughout the briefing by the appellant, they've been talking about delay, delay, and we delayed a lot. We did not delay a moment after the Process Patent Amendments Act. That's what spurred us into activity. We filed this case in 1990 in response to the Process Patents Amendments Act in order to create a test case because up until that time, it was essentially impossible. People might have thought I was a fool to have brought this test case in rail shot. As a matter of fact, this case must have been one of the most difficult cases this court has ever had because it was pending for 37 months after the oral argument. Right in this courtroom in November 1992, the case's argument was decided December of 1995. This court understood it to be a very serious challenge. It must have been a very close case. It was, as it turned out, to be a two-judge per current opinion after one of the judges had retired. So this was a very difficult test case. It was brought immediately after the Process Patent Amendments Act, and then a year after that. And we have uncontroverted evidence in this case. We have the Hirofumi Usami Declaration of Record in this case, one of the members of the Takeda staff who shows exactly what the delays were, and I submit there's not one iota of delay on the part of Takeda in pursuing the case up until 1990. Not one shred of evidence, not one piece of paper, not one page of file wrapper has been introduced by the government to show any bit of delay before 1990. So we moved quickly as soon as we could do this. Mr. Waker, going back to your little three-colored charts, you were telling me that Munguzi and Fermat were supposed to substantiate the Blue Process, but that's a very different, that's a displacement process. Gerlach and Munguzi were the B, they're method B, they're not the Blue Process. They're both displacement processes. They're different kinds of displacement processes, somewhat different routes. But what's important is the Gerlach and Munguzi patents, one of them actually refers to GB 276. By the way, on your delay point, didn't the board actually find that you had delayed? Yes, I think they did. What effect does that have on this patent? Well, the board thought that we could have filed earlier and gotten a patent, which is beyond comprehension to me. It's totally beyond comprehension. And Professor Thomas, in the article we cited in our brief, he chronicles the history of Ochi and what a difficult test case this was. I think whatever deference you normally give to the patent office on finding facts about delays, their entire basis for this delay is that we could have gotten a patent, which is just ridiculous. If you have no further questions, Your Honor, I'm pleased to submit. Thank you, Mr. Wagner. Thank you. Mr. Connolly, it seems the thrust of this argument is that the 1995 Act solved all the problems. Do you agree? Not at all, Your Honor. There are still problems out there, one of which is that if you have patentably indistinct claims, if you have patentably indistinct claims, what PTO wants to do is tie them together in a single patent so that they can't be split off and owned by two separate people. So the patentable distinctness question is still important. And, of course, it's still important in the restriction context. And so the core question here is, when is a product and process patentably distinct? That problem still exists. If a product and process are being owned by different people, how would that have that problem? The problem with having two people own patentably indistinct… One owns the product and the other owns the process. Sure, exactly. Then you have two lawsuits against anyone who either practices the product or the process. It doesn't matter because they're coextensive. But that's not this case. No, that's not this case. We've got a product that's made by one process, period. That's absolutely correct. But, again, we have to set up rules that will apply. So isn't it right in this case the 1995 Act covers it? The 1995 Act, of course, doesn't cover this case because… No, because this is, I know, this is pre. But, I mean, in this fact situation, were it to arise today, it would be governed by the 1995 Act. Yes, but there would be nothing to prevent Takeda from selling their process patent to some other entity. And when these decisions are made in the PTO, when there's a terminal disclaimer, for instance, they require the two patents to essentially become bound to each other. They tie them together so that they can't be transferred except as a unit. So these sorts of problems are, of course, are still there even after the 1995 Act. And, of course, the 1995 Act, there are still patents in the pipeline where the filing date is prior to 1995. And so those cases in the pipeline are still governed by pre-1995 law. The 1995 law mitigates the problem, to be sure, but it doesn't solve all problems. So you couldn't file a terminal disclaimer unless you had both the product and the process patent, right? That's correct, that's correct. I mean, I'm sorry, maybe I'm not understanding. Well, I'm just not finding very plausibly your suggestion that there's going to be a split between the product and the process. Well, if they're selling the process separate from the product, which are, as you said, a single invention. Well, they could if they had two separate patents that weren't tied together. If they had two patents, you patent the product first and the process second. So in this case, there's no restriction. Exactly. That Takeda would be capable of selling the process patent to someone else while retaining the product and somebody would be sued by both. Exactly. That's exactly the problem that Takeda is concerned about. To go back to this line in the sand, I think, to go back to the date of filing, what the district court found, there was some discussion of an alternate date and whether the date of filing of the second patent application was a good one. And the district court found, and candidly admitted, was that that's effectively no date at all. Because what the district court said was, look, if it's 1990, why not 2002? Why not 2005? Why don't they just hold their second patent application until an alternate process? Because under the new amended laws, the entire term will exhaust. That's true for cases after 2002. But you're making a policy argument that really doesn't apply to hard-leaning patents anymore. I mean, you're making a policy argument that only applies to those unique situations where you've got a product and a process for which there could arguably be double patenting and that had to have been both filed prior to 1995. I think they're similar. I can't imagine there's that many of those. I don't want to say that the situation would have been rising even after 1995. I'm not sure of that. I see that my time's up. No, please finish your thought. And I think what we've sort of come to here, I mean, that was it. The 1990 date is effectively no limit at all. And the district court candidly sort of found that. Thank you very much. All rise. The Honorable Court is adjourned until tomorrow morning at 10 o'clock.